IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| Kenneth R. Truitt, Jr., | Case No. 5:12 CV 1835 |
| Petitioner, | MEMORANDUM OPINION AND ORDER |
| -vs- | JUDGE JACK ZOUHARY |
| Jason Bunting, | |
| Respondent. | |

## INTRODUCTION

Petitioner Kenneth Truitt, Jr. filed a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 (Doc. 1). Respondent Jason Bunting answered the Petition (Doc. 11). Truitt then filed a Traverse, moving for summary judgment (Doc. 13), which Respondent opposed (Doc. 14). The Magistrate Judge's Report and Recommendation ("R&R") recommends this Court deny the Petition in full (Doc. 17 at 1). Truitt filed an Objection to the R&R (Doc. 20). In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981) and 28 U.S.C. §§ 636(b)(1)(B) & (C), this Court has reviewed the determination of the Magistrate Judge *de novo*. For the following reasons, this Court adopts the R&R and denies the Petition.

## BACKGROUND

Truitt is currently imprisoned by the State of Ohio following jury convictions on three counts: aggravated burglary, abduction, and assault. The state trial court initially sentenced Truitt to eight years of imprisonment for aggravated burglary; five years of imprisonment for abduction; and six-

months of imprisonment for assault.  The state trial court set these sentences to run concurrently, for a total of eight years of imprisonment.

Truitt appealed his convictions, claiming the trial court erred in five respects.  In resolving those challenges, the Ohio Ninth District Court of Appeals recounted Truitt's crimes.  *State v. Truitt*, 2011-Ohio-6599, at ¶¶ 9–20 (Ohio Ct. App. 2011):

> Cassandra Blackmon testified that on August 14, 2008, she heard her neighbor, Gwendolyn Hooks, screaming through the walls of their duplex for Blackmon to call 911.  Throughout the day, Blackmon had heard arguing coming from Ms. Hooks' apartment.  She knew that Truitt was at Ms. Hooks' apartment.  She heard Ms. Hooks screaming that she was being kicked and punched in the face, and to call for police.  Specifically, Blackmon heard Ms. Hooks say, "Why are you kicking me? You [are] just going to punch me in my face like that?"  Blackmon called 911 and said that her neighbor "was getting beat up" and could not leave.  Blackmon was scared and called 911 three times because the screaming kept getting louder.  It took the police over an hour to respond.  Once the police arrived, Blackmon went over to Ms. Hooks' home to check on her.  Blackmon testified that Truitt had left the duplex before police arrived.  Blackmon also testified that Ms. Hooks was "frantic" and "partially naked."  The apartment was a mess, and Ms. Hooks was bleeding and crying.  After police were finished questioning Ms. Hooks, Blackmon took her to the emergency room.
>
> Ms. Hooks testified that she met Truitt in May 2008.  The relationship began as a friendship and then escalated into a relationship.  She described Truitt as "[v]ery insecure, controlling, and very, very jealous[.]"  Although Truitt did not live with her, because he was her boyfriend, he did spend the night at times and kept some clothes at her house.  At the time, she believed he was living at 912 Bye Street with a friend.  Truitt did not have a key to her home.
>
> On August 14, 2008, Ms. Hooks was at home with her nephew, who at the time was eight or nine years old.  Truitt came over, and Ms. Hooks cooked dinner for the three of them.  After dinner, while her nephew was in the front room watching television, Truitt and Ms. Hooks began drinking and smoking marijuana in the dining room.  At some point, Truitt accused Ms. Hooks of having another man at her house.  This escalated into an argument, and then Truitt hit her in the face.  Ms. Hooks did not want her nephew to witness the argument, so she called her sister-in-law to pick him up.  A male arrived and took the nephew home.

2

Ms. Hooks testified that she repeatedly asked Truitt to leave the house, and that he refused. At one point, she went next door and called the police. She waited outside, but the police did not arrive. She went back into the home and again asked Truitt to leave. Truitt began yelling, cursing, and calling Ms. Hooks names. He told her if she "want[ed] to fool around with somebody" that he was "going to show [her.]" He proceeded to tear her clothes off of her, and she began screaming to her neighbor to call 911. Truitt began hitting her, punching her in her face and head, banging her head against the floor, and ripping her clothes off. She testified that he kept trying to put his fingers in her "private area." She tried to run out the back door, but he caught her and would not allow her to leave. He tried to apologize to her, and when she would not look at him, he punched her in the face, and she fell to the floor. He continued "stomping" and "punching" her. She managed to break free, and ran upstairs to the bathroom to call 911. Eventually, Ms. Hooks heard the police at her door. However, Truitt had left the house before they arrived. Ms. Hooks testified that, after the altercation, she had a bad bite mark on her ear and three bite marks on her hip. Hooks identified several photographs of her injuries. The day after the incident, Truitt called Ms. Hooks and left messages saying that he was sorry and that he loved her. Truitt wanted to come speak with Ms. Hooks, but she ignored the messages.

Officer Karlton Starks, a police officer with the city of Akron, responded to a 911 call regarding an assault at Ms. Hooks' apartment on August 14, 2008. He testified that, when he arrived, he noticed that Ms. Hooks' clothes were disheveled and she was very frantic and crying. He described the scene as "chaotic" and "in disarray." Ms. Hooks had an injury on her thigh several inches long that appeared to be a bite. After speaking with Ms. Hooks, Officer Starks turned the case over to the detectives and the Crime Scene Unit.

Sergeant Michael Rinn, the midnight supervisor of the Crime Scene Unit, testified that he responded to Ms. Hooks' apartment on August 14, 2008. He was told that the victim had been sexually assaulted. He took photographs of the scene and collected what appeared to be hair. He testified that some of the hair was collected near blood on the living room floor. He also took photographs of the victim. One photograph shows an injury to the back of her right ear, and another shows a bite mark on her right thigh.

Lynn Rogers, a triage nurse in the St. Thomas Emergency Department, testified that she saw Ms. Hooks in the emergency room in the early hours of August 15, 2008. She testified that Ms. Hooks reported that she had been assaulted by her significant other. Specifically, she was "hit repeatedly in head, kicked in the back, ha[d] positive bite mark to right leg" and the significant other "did attempt to choke her[.]" Ms. Hooks "had a major injury to the left side of her upper lip." When asked what level of pain she was experiencing on a scale of zero to ten, Ms. Hooks responded that she was at a seven. She specifically said that she felt pain in her mouth and her head. Rogers' reports indicate that "[b]ite wounds" were cleansed on the ear, thigh, and buttocks

3

area.  Because this was reported as a sexual assault, Rogers contacted the Domestic Violence Enforcement Unit ("DOVE") unit.

Valorie Prulhiere, a sexual assault nurse with the DOVE unit, testified that she examined Ms. Hooks and took a statement from her on August 15, 2008.  Ms. Hooks named Truitt as the assailant.  Prulhiere also collected swabs from Hooks' thigh and flank.  Those swabs were given to police.

Detective John Ross testified that he collected DNA samples from Ms. Hooks and Truitt and submitted them for analysis.  BCI forensic scientist Lindsey Nelsen-Rasch testified that she received the samples.  The samples were sent to LabCorp for analysis.

LabCorp forensic scientist Shaw Weiss testified that LabCorp examined swabs from Ms. Hooks' wounds for DNA.  There was a partial profile from the flank wound that was consistent with Truitt.  The thigh wound showed a mixture consistent with Ms. Hooks and Truitt.  LabCorp also did Y-STR testing, a better exclusion than inclusion test since all males in the paternal lineage will have the same Y-STR profile.  Using Y-STR, Truitt and his paternal relatives could not be excluded as a source of the DNA on the thigh wound.

Wanda Newsome testified that she and Truitt had previously been in an on and off again relationship.  They were a couple in December of 1995.  On December 3, 1995, Truitt "jumped" her.  He bit her on the ear, arm, and forehead.  This testimony was allowed after a cautionary instruction by the court limiting the purposes for which the jury could consider the testimony.

Truitt did not present any testimony or offer any exhibits in his defense.  During closing arguments, he admitted that he assaulted Ms. Hooks.

In December 2011, the Ohio court of appeals rejected claims that Truitt's burglary[1] and abduction convictions went against the manifest weight of the evidence, along with three evidentiary objections not relevant to this federal habeas action.  The court did, however, remand for a determination of whether Truitt's convictions were for allied offenses of similar import for sentencing

---

[1] The state appellate court's opinion mislabels Truitt's burglary conviction as a robbery conviction.  *See id.* at ¶ 6.  As the Magistrate Judge explains, that error likely has its origin in Truitt similarly mislabeling his burglary conviction in his appellate brief.  However, as is evident from the parties' appellate briefing, the state appellate court was confronted with against-the-manifest-weight-of-the-evidence arguments tailored to Ohio's burglary statute (*see* Doc. 11-1, Ex. 10 at 49–57; Doc. 11-1, Ex. 11 at 87–90).

purposes. *Id*. at ¶¶ 46–48. The Supreme Court of Ohio denied Truitt's appeal of his conviction. *State v. Truitt*, 131 Ohio St. 3d 1501 (2012). On remand, the state trial court merged Truitt's abduction and assault convictions, again sentencing Truitt to a total of eight years of imprisonment (Doc. 11-1, Ex. 26).

Truitt next filed the present Petition, claiming two grounds of federal habeas relief: (1) his conviction for aggravated burglary was against the manifest weight of the trial evidence, and (2) the same legal error with respect to his conviction for abduction (Doc. 1 at 5-7). Magistrate Judge White received Truitt's Petition on referral, and in a thorough R&R recommended this Court deny Truitt's Petition (Doc. 17). Truitt objected to the R&R on two grounds, raising much the same arguments as those presented to the Magistrate Judge.

## STANDARD OF REVIEW

When a federal habeas claim has been adjudicated by the state courts, the Antiterrorism and Effective Death Penalty Act ("AEDPA") provides the writ shall not issue unless the state decision "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A federal court may grant habeas relief if the state court reaches a decision contrary to the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). The appropriate standard is whether a state court's application of clearly established federal law was unreasonable, and not merely erroneous or incorrect. *Id.* at 409–11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). This is a demanding standard met "only if reasonable jurists would find it so arbitrary,

unsupported or offensive to existing precedent as to fall outside the realm of plausible, credible outcomes." *Barker v. Yukins*, 199 F.3d 867, 872 (6th Cir. 1999).

Moreover, "[i]n situations in which a petitioner has failed to fairly present federal claims to the state courts, and a state procedural rule now prohibits the state court from considering them, the claims are considered procedurally defaulted." *Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (citing *Martin v. Mitchell*, 280 F.3d 594, 603 (6th Cir. 2002)). "While in such situations the exhaustion requirement is technically satisfied because there are no longer any state remedies available to the petitioner . . . the petitioner's failure to have the federal claims considered in the state courts results in a procedural default of those claims that bars federal court review." *Id.* at 605 (citation omitted). The Sixth Circuit applies a three-part test to determine if a claim is procedurally defaulted: (1) a state procedural rule applies to petitioner's claim and petitioner failed to comply with it; (2) the state actually enforced the procedural sanction; and (3) the state procedural forfeiture is an "adequate and independent" state ground on which to foreclose federal habeas review. *Buell v. Mitchell*, 274 F.3d 337, 349 (6th Cir. 2001); *see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

## DISCUSSION

### *Procedural Default*

The state appellate court described its task of reviewing Truitt's against-the-manifest-weight-of-the-evidence claims to include "review[ing] the entire record, weigh[ing] the evidence and all reasonable inferences, consider[ing] the credibility of witnesses and determin[ing] whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Truitt*, 2011 WL

6

6749811, at ¶ 7. Having reviewed Truitt's convictions in that way, the state appellate court necessarily determined Truitt's convictions rested on constitutionally-sufficient evidence under the *Jackson* standard. *See Nash v. Eberlin*, 258 Fed. App'x. 761, 765 (6th Cir. 2007). Therefore, this Court reads Truitt's *pro se* Petition liberally, and treats Truitt's against-the-manifest-weight-of-the-evidence challenges, not cognizable on federal habeas review, as ones arguing the State of Ohio presented the jury insufficient evidence to sustain a conviction with respect to either the aggravated burglary or abduction charges. Procedural default bars neither claim.

### *Ground One: Sufficiency of the Evidence -- Aggravated Burglary*

Truitt maintains the State presented insufficient evidence to sustain his jury conviction for aggravated burglary. Under *Jackson v. Virginia*, 443 U.S. 307 (1979), the relevant question for a sufficiency-of-the-evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319 (emphasis original). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, \_\_\_U.S.\_\_\_, 132 S. Ct. 2, 4 (2011) (per curiam).

Truitt was convicted of aggravated burglary under the following statute:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if any of the following apply . . . . The offender inflicts, or attempts or threatens to inflict physical harm on another.

R.C. § 2911.11(A). As the Magistrate Judge notes, the state trial court incorporated each of these statutory elements into its aggravated burglary jury instructions (compare *id*., with Doc. 11-5, Tr. at 96–103).

7

Truitt does not dispute the events giving rise to his convictions occurred in an occupied structure while another person, not an accomplice to the crime, was present. Nor does Truitt dispute he committed a criminal offense while in an occupied structure -- the assault, which he admitted, through counsel, at closing argument -- or that the predicate offense involved "inflict[ing] physical harm on another." Rather, Truitt disputes he trespassed in Hooks' duplex by the use of "force, stealth, or deception" with the purpose of committing the assault.

This Court disagrees. When viewed in the light most favorable to the prosecution, the jury heard sufficient evidence to rationally conclude the State had proved beyond a reasonable doubt the trespass element of the Ohio aggravated burglary statute. Hooks testified she lived alone (Doc. 11-3, Tr. at 61); Truitt visited the house only as an occasional guest, not a live-in boyfriend (*id.*); Truitt resided at a nearby address, which address Hooks provided (*id.*); and Truitt did not have a key to the duplex (*id*. at 62). Hooks also testified that, during the assault, she asked Truitt to leave (*id*. at 68–69). A jury could conclude the trespass was consummated by force because under Ohio law an individual begins to trespass, notwithstanding prior invitation to enter a home, by beginning to assault the person who extended the initial invitation to enter the home. *State v. Steffen*, 31 Ohio St. 3d 111, 115 (1987) (noting defendant's "privilege to remain in [the victim's home] terminated the moment he commenced his assault on her"); (*see also* Doc. 11-3, Tr. at 67–71) (relating Hooks' testimony of the assault). Moreover, under Ohio law, the "purpose to commit any criminal offense" element of the aggravated burglary statute "may be formed while the trespass is in progress." *State v. Fontes*, 87 Ohio St. 3d 527, 530 (2000).

To counter this evidence, Truitt asserts, without foundation, that Hooks lied under oath (*see* Doc. 20 at 2–3). He also claims he resided at the duplex with Hooks, and so could not have

8

committed burglary in the duplex with the requisite *mens rea* (*see* Doc. No 11-1, Ex. 10 at 57) (presenting to the state appellate court Truitt's argument that because he "had the mindset that he was living [with Hooks] . . . Truitt did not act either knowingly or recklessly" when committing the trespass)). The Ohio court of appeals, in the context of Truitt's against-the-manifest-weight-of-the-evidence challenges, considered and rejected these arguments, finding Hooks' testimony contained only "minor inconsistencies." *Truitt*, 2011-Ohio-6599, at ¶ 22. This Court cannot conclude that determination was unreasonable.

More broadly, Truitt objects that the state factfinder failed to properly consider "the legitimate exculpating factors" presented by Hooks' and Newsome's testimony (Doc. 20 at 4). That argument misunderstands the *Jackson* standard. Even assuming these witnesses testified in ways favorable to the defense, the question before this Court is not whether the jury somehow erred in the factual conclusions it reached, but instead whether the State presented to the jury sufficient evidence. Truitt's attempts to reargue the factual inferences that should have been drawn at trial have no place in federal habeas review.

### *Ground Two: Sufficiency of the Evidence -- Abduction*

Truitt's conviction for abduction was entered under a statute that provides "[n]o person, without privilege to do so, shall knowingly . . . . by force or threat of force, restrain the liberty of another person under circumstances that create a risk of physical harm to the victim or place the other person in fear." R.C. § 2905.02(A)(2). Applying the *Jackson* standard, this Court cannot say the state appellate court acted unreasonably in concluding the State presented to the jury sufficient evidence to sustain Truitt's conviction under that statute.

9

The jury, again, heard Truitt admit he used force during his altercation with Hooks (Doc. No. 11-5, Tr. at 57). The jury also heard testimony that Truitt restrained Hooks. On this point, the jury first heard testimony from Blackmon, Hooks' next door neighbor, who called police at Hooks' request (Doc. 11-3, Tr. at 37). Blackmon testified she "reported that my neighbor was getting beat up. . . . [Truitt] wouldn't allow her to leave the house. You know, she was trying to leave" (*id.*). Hooks then testified that, during the beating , she tried to escape from the duplex. Truitt caught her at the back door and continued the violent assault. Hooks testified "I just couldn't get away. I was trying and I couldn't get out the door" (*id.* at 74). Hooks eventually barricaded herself in an upstairs bathroom until the police arrived (*id.* at 75). Finally, the jury learned Truitt's efforts to detain Hooks "creat[ed] a risk of physical harm" as they listened to Hooks describe the beating she suffered at the back door, during which Truitt punched Hooks in the face and stomped on her body after Hooks fell (*id.* at 74).

Truitt focuses on the state's request for a lesser-included offense instruction of unlawful restraint, to go along with the abduction instruction (Doc. 20 at 6–7). Truitt finds that request significant because, citing Ohio case law, he argues such an instruction "is required only where the evidence presented at trial would reasonably support both an acquittal on the crime and a conviction upon the lesser-included offense" (Doc. 1-2 at 6) (citing *State v. Thomas*, 40 Ohio St. 3d 213, 216 (1986)). Thus, Truitt argues, in requesting the unlawful restraint instruction, the State essentially admitted it failed to present constitutionally sufficient evidence to support the abduction conviction.

Truitt's logic is faulty. Ohio law relating to lesser-included instructions focuses on one possible outcome of the jury's deliberations: the potential that the jury could reasonably determine the State had failed to carry its burden on the greater offense. That is a very different focus from the *Jackson* inquiry facing this Court: whether, based on the evidence presented at trial, viewed in the

10

light most favorable to the prosecution, a rational jury could *only* conclude the State had failed to carry its reasonable-doubt burden with respect to each element of the abduction offense. The state appellate court did not act unreasonably in determining the answer to that question was "No."

### *Request for Polygraph*

Truitt concludes his objections to the R&R with what appears to be a request for a court-ordered polygraph examination (Doc. 20 at 7–8). This Court treats that request as one seeking an evidentiary hearing: it asks this Court to gather evidence not presented to any state court. The request is frivolous. AEDPA bars a habeas court from holding an evidentiary hearing without first determining the petitioner has made certain showings, none of which Truitt even attempts. *See* 28 U.S.C. § 2254(e)(2). Truitt's request for a polygraph examination is denied.

### CONCLUSION

For all the above reasons, this Court adopts the R&R (Doc. 17) and denies the Petition (Doc. 1). Further, because Truitt has not made a substantial showing of the denial of a constitutional right, this Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

October 29, 2013